STILPHEN v. STILPHEN & a.

Under the general presumption of fact that a retroactive operation of a statute is not intended by the legislature, the abolition of husband's and wife's tenancy of entireties is construed not to be applicable to property acquired by them before the abolishing act took effect.

PETITION FOR PARTITION, of a farm in Conway. Facts agreed. The farm was conveyed to George P. Stilphen and Nancy, his

wife, May 4, 1839. The plaintiff is one of their two children. His claim is, that, at his mother's death in 1881, one quarter of the farm passed from her to him by descent. George P. died in 1887. By his will, made in 1887, he devised the farm to two of the defendants.

*F. B. Osgood* and *J. C. L. Wood,* for the plaintiff, cited *Clark* v. *Clark,* 56 N. H. 105; *Miller* v. *Dennett,* 6 N. H. 109; *Stevenson* v. *Cofferin,* 20 N. H. 150.

*E. A. & C. B. Hibbard* and *J. H. Hobbs,* for the defendants.

I. Conveyances to husband and wife were not affected by the act of 1809, which has now become (without change of meaning) G. L., *c.* 135, *s.* 14.

1. The language used not only does not show an intention to make such a change, but shows the absence of such intention. The preamble to the original act is,—" Whereas it often happens that joint tenancies are created, against the intentions of the parties, to gifts, grants, and other conveyances, and also of testators, through ignorance of the proper terms to create estates in common." The main act itself provides that estates of two or more persons, in lands, " shall be taken, deemed, and adjudged to be estates in common, and not in joint tenancy," unless words are used in the instruments creating them, " clearly and manifestly showing it to be the intention of the parties " thereto that such lands " should vest and be held as joint estates, and not as estates in common." Similar language is used in the statute in its present form. This shows that instruments that without the statute would have created joint tenancies, without clearly expressing such an intention, are what the statute is intended to apply to.

2. If conveyances to husband and wife are affected by the statute, the result is anomalous. An estate in common is created, unless there is a clear intention of creating a joint tenancy. No matter how clearly an intention of creating a tenancy by entireties was expressed, a tenancy in common would be created. If an intention of creating a joint tenancy was clearly expressed in a conveyance to husband and wife, the statute would not apply, and therefore a tenancy by entireties would be created, as at the common law; for, though a joint tenancy of husband and wife was recognized by the law as a possibility where they married after the conveyance, to suppose that husband and wife should in such a case hold as joint tenants instead of as tenants by entireties is to impute to the statute an improbable intention, which would have been pretty sure, if intended, to be distinctly expressed.

3. The features which made joint tenancy odious, and led to the passing of the statute, are characteristics of tenancy by entireties also, but have in the latter case never been regarded as odious. The inconvenience of survivorship was that of a lottery. A pru-

dent man prefers a certainty for his heirs to half the chance of a double prize, although the value of the expectation is the same. But in the case of husband and wife, the heirs are commonly the same persons—their children. When the husband and wife have different heirs, those heirs will commonly not be children of either party, and therefore will not be the kind of heirs which the party would be most distressed to have lose their inheritance. What inconvenience there is, is of the same kind as that caused by dower and courtesy. A man buying land would pay much less for it if it were subject to an incumbrance such as dower in favor of some person in whom he had no interest, but it has never been remarked that married men living amicably with their wives, and those that expect to be married, will pay less for land than the most confirmed bachelors. Again : The inconvenience as to alienation which distinguishes this kind of tenancy on account of its requiring the concurrence of the two owners, is of the same nature as the inconvenience caused by the inchoate right of dower. This inconvenience is no doubt sometimes real and serious, but in the great majority of cases not.

4. The common-law relations of husband and wife still existed. It is unlikely that the first change in them should have been made in this particular. It is unlikely that this first change, if intended, should not have been followed up for so many years. It is unlikely that so important a change should have been determined upon at the same time as the change for which the statute was avowedly passed, or that it should have been intended and not distinctly expressed. It is unlikely that the court should have been directed in doubtful language to interpret conveyances as creating a tenancy in common between husband and wife, when it was up to that time (and, we believe, is still) doubtful whether such an estate could be created at common law by words clearly expressing such an intention. 4 Kent 363; *Dias* v. *Glover*, 1 Hoff. Ch. 71; *Stuckey* v. *Keefe's Executors*, 26 Pa. St. 397.

5. The decisions under this statute and those in other states under similar statutes are almost unanimous in holding that tenancies by entireties are not affected. We cite only a few of them. Others will be found in the text-books cited. *Wentworth* v. *Remick*, 47 N. H. 226; *Shaw* v. *Hearsey*, 5 Mass. 521; *Fox* v. *Fletcher*, 8 Mass. 274; *Varnum* v. *Abbot*, 12 Mass. 474; *Bertles* v. *Nunan*, 92 N. Y. 152; *Carver* v. *Smith*, 90 Ind. 222; *Marburg* v. *Cole*, 49 Md. 402; 4 Kent 362; 2 Bl. Com. (Cooley's ed.) 182, *notes ;* 1 Wash. Real Prop. 278. The express exception of conveyances to husband and wife from the operation of the law respecting the interpretation of conveyances to two or more persons in general, which exists at present in Massachusetts, did not exist in the original statute, and is later in date than the decision in *Shaw* v. *Hearsey*. The case was not decided upon the statute, but the statute was founded upon the case.

II. The various statutes enlarging the rights and liabilities of married women have no effect on the question under discussion. The statutes before 1860 were very limited in their application, and we suppose no one pretends that they have anything to do with the case. The statute of 1860, c. 2342, s. 1, provides "That every married woman shall hold to her own use, free from the interference or control of her husband, all property inherited by, bequeathed, given, or conveyed to her; provided such conveyance, gift, or bequest is not occasioned by payment or pledge of the property of the husband." The latter part of s. 3 of the same act provides that "any married woman, holding property to her sole and separate use, free from the interference or control of her husband, may sue and be sued in her own name, as though sole, in all matters pertaining to said property, and upon all debts contracted by her before her marriage." These provisions are held to have abolished tenancies by entireties. *Clark* v. *Clark*, 56 N. H. 105.

1. It is plain that a literal interpretation of the statute will leave tenancies by entireties undisturbed. At common law a conveyance to the husband enabled him to hold free from the interference or control of his wife, yet a conveyance to husband and wife made them tenants by entireties. Now a conveyance to the wife enables her to hold free from the interference or control of her husband, and therefore a conveyance to husband and wife does not make them tenants by entireties. The logic of such an argument is certainly obscure. No right is given the wife by either s. 1 or s. 3 of this act which was not a right of the husband at common law, and therefore consistent with the continued existence of tenancy by entireties.

2. The contention of those who think this statute accomplished the abolition of tenancy by entireties is, that it obliterated the legal unity of husband and wife; that it endowed the wife with the rights and made her subject to the liabilities of an unmarried woman; that it annihilated her husband's marital rights in her estate. A married woman became in 1840 capable of holding property in her own right, and in 1841 capable of making contracts, suing, and being sued in her own name, though only under special circumstances involving fault of the husband. In 1845 she became capable of devising real estate. In 1846 she became capable of holding property to her sole and separate use, free from her husband's control and interference, and of making contracts, of suing and being sued, with respect to such property, these capacities being independent of any act of the husband, and therefore belonging to all married women, although either an antenuptial contract or the expressed will of the grantor or testator was necessary for their creation in any particular woman. The contracts and suits thus authorized might be between husband and wife. St. 1840, c. 573; St. 1841, c. 607; St. 1845, c. 236; St. 1846, c. 327;

*Albin* v. *Lord*, 39 N. H. 196; *Bank* v. *Clark*, 46 N. H. 134; *Clough* v. *Russell*, 55 N. H. 279.

Was tenancy by entireties abolished in 1840? or in 1841? or in 1846? A married woman acquired in 1860 no capacity she had not had before. It merely became no longer necessary to put certain words into a conveyance or will in order to endow her with such capacity. That was the only change made by the statute of 1860. So far as the argument of *Clark* v. *Clark* rests on the increased capacity of married women, it must logically be held that tenancy by entireties was abolished as early as 1846, or not till after 1860. But, it may be said, the statute of 1860 indicated a new way of regarding married women. The capacities she might have had before, she had now as a matter of course. Well, if those capacities had been complete, so that her common-law incapacity had been wholly removed, there might have been some force in that argument. But in fact her capacity remained as it had been, except for holding property that came to her in some one of the ways mentioned by the statute, and for making contracts, suing or being sued, with respect to such property. She could not hold her own earnings till 1867. She was not liable on her contracts generally till 1876. She could not sue or be sued alone for torts not connected with her property till 1876. It was not thought certain till 1865 that she could hold as her separate property what came to her before marriage, unless there was an antenuptial contract to that effect, or a special provision in the instrument of conveyance. It was further considered that the provision as to liability for debts contracted by her before marriage, not being materially changed in 1860 from what it had been in 1846, might mean only debts contracted in respect to her property, and she was therefore made generally liable and her husband was released from liability in 1871. St. 1865, *c.* 4080 ; St. 1869, *c.* 35 ; St. 1871, *c.* 27; St. 1876, *c.* 32. Now it may be that the three judges that decided *Clark* v. *Clark* in 1875 considered carefully just how much capacity on the part of married women was consistent with the continuance of tenancy by entireties, and at what point that form of tenancy became too anomalous to be longer borne, and found as a result of such consideration that the turning-point was reached in 1860 ; it may be that they found out by examination of ancient cases that nothing but legal unity of husband and wife had led to the introduction and toleration of this kind of estate, and that a certain amount of legal unity was requisite, which amount was more than was left after 1860. While this may have been the case, the opinions show no signs of it. They read on this point like off-hand opinions. The judges seem to have thought that a good many of the ancient peculiarities incident to the relation of husband and wife had gone, and that tenancy by entireties was not of much account and might as well go too. We shall undertake to show hereafter that this is the only case on

this subject where a point in issue was treated in this way.   There are a few cases where the court seem to have thought they were making changes in the law of this subject not required by the statutes, but such changes are justified in elaborate opinions, and perhaps it will appear on examination that even those changes were a fair result of existing statutes, without reading between the lines any intention of the legislature not expressed or even hinted at.

3. The well considered opinion in *Bertles* v. *Nunan* is of great weight upon this question.   The New York statutes there discussed are much like those of this state, going somewhat further than the statutes relied on in *Clark* v. *Clark*.   It had also been argued with much ingenuity by one judge, with the concurrence of two more, in a previous case, *Meeker* v. *Wright,* that tenancy by entireties was abolished, though that case was decided on another point.   The arguments presented in *Bertles* v. *Nunan* are applicable here.   Many authorities are cited, to which we refer the court without repeating the citations.   *Bertles* v. *Nunan,* 92 N. Y. 152.

4. An examination of the cases in which the married women's statutes of this state were involved may bear on this case in several ways.   The decisions are authorities as to what the statutes really meant.   Even if they should be now seen to have been erroneous, time and acquiescence may have given them the force of law. Their spirit and tendency, whether too liberal or too strict, may have been relied on to such an extent that a correction at this time would unsettle titles, and lead to more practical disadvantage than theoretical advantage.   We shall therefore examine some of the cases since the statute of 1860, adding a few of those decided on prior statutes where they seem valuable for illustration.

(*a*) Until the statute of 1876, *c.* 32, the court uniformly held that a married woman could make contracts only with respect to her separate property.   *Ames* v. *Foster,* 42 N. H. 381 ; *Wheeler* v. *Emerson,* 44 N. H. 182 ; *Shannon* v. *Canney,* 44 N. H. 592 ; *Carleton* v. *Haywood,* 49 N. H. 314 ; *Wellcome* v. *Riley,* 52 N. H. 139 ; *Whipple* v. *Giles,* 55 N. H. 139 ; *Blake* v. *Hall,* 57 N. H. 373 ; *Muzzey* v. *Reardon,* 57 N. H. 378 ; *Messer* v. *Smyth,* 58 N. H. 298 ; *Bank* v. *Sanborn,* 60 N. H. 558 ; *Luther* v. *Cote,* 61 N. H. 129.   On the question what was her separate property and whether the contract was made with respect to it, the statutes were construed liberally (*Jordan* v. *Cummings,* 43 N. H. 134, *Nims* v. *Bigelow,* 45 N. H. 343, *Houston* v. *Clark,* 50 N. H. 479, *Cooper* v. *Alger,* 51 N. H. 172, *Hammond* v. *Corbett,* 51 N. H. 311, *Read* v. *Hall,* 57 N. H. 482, *Pearson* v. *Pearson,* 60 N. H. 497), but were not extended beyond what seemed to be the fair meaning of the language actually used (*Ames* v. *Foster, supra, Wheeler* v. *Emerson,* 44 N. H. 182, 187, *Hoyt* v. *White,* 46 N. H. 45, *Vogt* v. *Ticknor,* 48 N. H. 242, *Woodman* v. *Woodman,* 54 N. H. 226, *Blake* v. *Hall, supra, Muzzey* v. *Reardon, supra, Bank* v. *Sanborn, supra*), and in a few cases were perhaps not

construed as liberally as they should have been. *Pettingill* v. *Butterfield*, 45 N. H. 195 ; *Hoyt* v. *White*, 46 N. H. 45. Some of these cases have been overruled (for instance, *Blake* v. *Hall* and *Muzzey* v. *Reardon* by *Messer* v. *Smyth*, and *Vogt* v. *Ticknor* by *Pearson* v. *Pearson*), or doubted (for instance, *Hammond* v. *Corbett* in *Read* v. *Hall* and in *Muzzey* v. *Reardon*) ; but this was on the question whether the contract was made with respect to the wife's separate property, and does not affect the point for which we cite them, namely, that the court undertook to construe the statutes with respect to a married woman's capacity to make contracts, and did not begin with a general assumption that the effect of the statutes was to abolish the common-law unity of husband and wife, or to abolish the wife's common-law incapacity, or with any other general assumption whatever, and then proceed to develop the consequences of that assumption without further reference to the statutory language.

(*b*) When married women are authorized to make contracts, and to sue and be sued in certain cases, as if they were unmarried (Stat. of 1846) or as though sole (Stat. of 1860), it is evident that contracts and suits between husband and wife are literally authorized, since if a woman were unmarried or sole the man that is in fact her husband would not be her husband, and she would sustain no different relation to him from what she would to any other man. The court have not been inclined to rely too strongly on the letter of the law, but have considered in many of the cases that have arisen on this point what was its spirit, and in that way have gradually advanced to what is undoubtedly the true view, that the meaning and scope of the statutes are not to be restricted by supposing that the legislature could not possibly have meant what it literally said, since it said it in a general way and might not have thought of the particular instance. *Albin* v. *Lord*, 39 N. H. 196 ; *Dickinson* v. *Davis*, 43 N. H. 647 ; *Patterson* v. *Patterson*, 45 N. H. 164 ; *Bank* v. *Clark*, 46 N. H. 134 ; *Clough* v. *Russell*, 55 N. H. 279 ; *Stratton* v. *Stratton*, 58 N. H. 473 ; *Rundlett* v. *Ladd*, 59 N. H. 15 ; *State* v. *Hayes*, 59 N. H. 450 ; *Jones* v. *Roberts*, 60 N. H. 216. But to rely on the spirit of the law as a reason for adhering strictly to its letter and for not making exceptions to its application, with nothing in the text to show or suggest that they were intended, is a very different thing from relying on its spirit as a pretext for disregarding its letter, or for extending its scope far beyond anything that is expressed.

(*c*) On the question of the joinder of husband and wife where the husband had no interest except as husband, the court followed the statutes strictly. Until the statute of 1876, *c.* 32, the husband was a proper and necessary party for torts committed after the marriage and not relating to the wife's separate property. *Whidden* v. *Coleman*, 47 N. H. 297, 300 ; *Moore* v. *Butler*, 48 N. H. 161 ; *Saltmarsh* v. *Candia*, 51 N. H. 71 ; *Emerson* v. *Shaw*, 57

N. H. 223.   And he was either a joint or the sole party, exactly as at common law, in other cases not within the express exceptions.   *Jordan* v. *Cummings*, 43 N. H. 134; *Carleton* v. *Haywood*, 49 N. H. 314; *Dutton* v. *Rice*, 53 N. H. 496.   When the cause of action related to the wife's separate property, the husband was of course not a proper party.   *Whidden* v. *Coleman*, 47 N. H. 297; *Cooper* v. *Alger*, 51 N. H. 172; *Alexanders* v. *Goodwin*, 54 N. H. 423; *Cahoon* v. *Coe*, 57 N. H. 556, 599.   Since the statute of 1876, the husband is not a proper party merely as a husband.   *Harris* v. *Webster*, 58 N. H. 481; *Plummer* v. *Ossipee*, 59 N. H. 55.

From a remark of the court in *Harris* v. *Webster* (*p.* 484) it would seem that counsel had argued that the statute of 1876 referred to matters of contract only.   Such a view of its meaning was completely refuted by the court in their elaborate opinion, and was on its face improbable.   So far as actions on contracts were concerned the statute was wholly meaningless, unless it meant that the husband should not be joined.   It may be remarked that the present form of the statute ( G. L., *c.* 183, *s.* 12) does not preserve the full force of the statutes which it attempts to consolidate.   It is so expressed as to make the first proviso of the statute of 1876 apply to the statute of 1860, which contained nothing of the kind.

(*d*) Husband and wife have been allowed to testify for or against each other only so far as statutes distinctly authorized. *Smith* v. *Railroad*, 44 N. H. 325; *Young* v. *Gilman*, 46 N. H. 484; *Blain* v. *Patterson*, 47 N. H. 523; *Moore* v. *Butler*, 48 N. H. 161; *State* v. *Moulton*, 48 N. H. 485; *State* v. *Straw*, 50 N. H. 460.

(*e*) The general duty of the husband to support the wife still exists.   *Perkins* v. *George*, 45 N. H. 453, 454; *Smith* v. *Davis*, 45 N. H. 566; *Drew's Appeal*, 57 N. H. 181; *Ferren* v. *Moore*, 59 N. H. 106.   The last of these cases contains a hint that perhaps that duty may not be absolute.   Since the husband was at common law bound only to make reasonable provision for his wife's support, and the station of the parties and his means were always material in determining what was reasonable, it would seem probable, even without the hint referred to, that the changes made by the statutes in regard to the ownership and control of property would produce some modification of this duty; that it might sometimes be unreasonable at the present day to hold him under any obligation.

(*f*) The husband's right to his wife's service and society was also different in different cases, according to what seemed reasonable under the particular circumstances, there never, we think, having been any such decision as that a millionaire might, if he chose, oblige his wife to take in washing.   It follows that a change in customs, to say nothing of a change in laws, might incidentally produce a modification of his right.   So far as concerns his right to the earnings of her services, it was indeed absolute, but was

expressly abolished by the general statutes. The only judicial intimation of any change of the law in this respect is a decision that husband and wife may so exercise their equal rights as to give neither any ground of fact for a claim of loss of either service or society. This appears to be a necessary consequence of the statutes. *Hazen* v. *Railroad*, 63 N. H. 390.

(*g*) Since a married woman has become capable of revoking her will made before marriage, a revocation of such will by marriage is no longer implied, it not being possible to suggest any reason that it should be implied in her case any more than in the case of her husband. *Fellows* v. *Allen*, 60 N. H. 439.

(*h*) It having been the better opinion, before statutes had altered the rights of married women, that a widowed mother has some right to the earnings of her minor children, and there being no well established difference between her rights and those of the father, if alive, the court might be expected to reject such differences as had been vaguely suggested or occasionally held to exist, when the reason for any difference had disappeared. It has accordingly been held that no such difference now exists. *Hammond* v. *Corbett*, 50 N. H. 501.

(*i*) Tenancy by entireties has come before the court in only two cases— *Wentworth* v. *Remick*, 47 N. H. 226, and *Clark* v. *Clark*, 56 N. H. 105. In the first, it was held still to exist; in the second, to have been abolished. In the first case, the title accrued before 1860; in the second case, after;—but this distinction was not adverted to in the first case. In both cases the interest was for life only. In neither case was survivorship distinctly in question, but this does not seem to affect their value as authorities. In *Clark* v. *Clark*, the property decided to have been held in common and not by entireties was two promissory notes, which were mere choses in action, and mortgages to secure them, which were equitably regarded, even in courts of law, as personal property, and follow the debt. We are unable to see how any question of tenancy by entireties was presented. The property being choses in action, the husband at common law was entitled to the whole, if he chose to reduce his wife's share to possession. If he did not reduce it to possession, his widow might collect the whole note after his death; but we are not aware of any authority for holding that she would be entitled to retain the whole by right of survivorship, except where the *jus accrescendi* existed in its original form, and the survivor of two joint creditors was not obliged to account for any part of the debt when collected. The action still survives, in order that the debtor may not be subjected to two suits; but the matter is adjusted between the survivor and the representatives of the deceased. The law would not have been guilty of the absurdity of giving the husband less rights in a note to him and his wife than in a note to her alone. We never heard that the concurrence of husband and wife was necessary for the

transfer by endorsement of a note running to them. We submit that it would at common law pass by the endorsement and delivery of the husband alone, and that the wife's endorsement would be a nullity. If so, Clark's half, of course, passed to his assignee in bankruptcy, and his wife's half would at common law have passed or not, according as he had or had not reduced it to possession, but, under the statutes in force at the time of Clark's bankruptcy, would not have been affected by the assignment.

5. We have now cited all the cases bearing on this subject that we have noticed, except some that are difficult to classify and that do not seem of enough importance to require separate treatment. We think there is no case that goes beyond the plain words of the statutes which we have not cited. The result seems to us to be as follows: (*a*) There are some ancient rules of which the reason is clear. If that reason has ceased to exist, whether by statute or otherwise, the rule no longer holds. (*b*) There are some ancient rules in the application of which to any particular case the reasonableness of the result was always a material circumstance. Statutory changes in the rights of the parties might obviously change or wholly abrogate such a rule, without distinctly mentioning it. A change in public sentiment, whether evidenced by legislation or not, may modify the popular, and therefore the judicial, view as to what is reasonable. (*c*) Still other rules were absolute in their application, with no variation according to the circumstances of a particular case, and were not based on reasons that can be clearly ascertained. These rules remain until changed or abrogated by statute, either directly or by necessary implication. The probable intention of the legislature is properly considered in construing such statutes, and public opinion may legitimately aid in determining what was the probable intention; but this is only for the purpose of deciding between different constructions to which the language actually used is liable. Under the first and second of these principles, but few cases have been decided; but the principles, at least the second, are evidently susceptible of a wider application than they have yet received. Most of the cases fall under the third principle, and we believe *Clark* v. *Clark* to be the only case that has departed from it. This departure was of course the result of treating tenancy by entireties as falling under the first principle, since no one can pretend that it falls under the second.

6. If the peculiarities of tenancy by entireties come from any particular discoverable reason, that reason must be the legal unity of husband and wife. The legal unity of husband and wife was not abolished at the time *Clark* v. *Clark* was decided, which was before the statute of 1876. But let us admit, for the sake of argument, that the statute of 1876 expressly abolished the last vestige of the incidents of this unity with the sole exception of tenancy by entireties. On what principle can it be held that the succes-

sive abolition of the different results of a legal idea until only one is left causes incidentally the abolition of that last one and of the whole idea? Why should the abolition of the next to the last abolish the last, any more than the abolition of any preceding one abolished the succeeding ones? Women may now vote at school-meetings. Does this show that the idea of their incapacity to vote is abolished, and that they may now vote at any elections? Suppose they are next allowed to vote for town and county officers: will this extend their capacity any further than is expressly stated? Suppose they are then authorized to vote for senators and councillors, for congressmen and for presidential electors: may they then vote for governor? We believe the court would shrink from so deciding, although it would probably hold that they might vote for representatives, the ambiguity of the expression "town officers" being resolved by considering the general course of legislation. The last would be interpreting a law; the first would be making one.

7. That feature of tenancy by entireties which is most distinctly explainable as resulting from the legal unity of husband and wife is, that, in a conveyance to husband and wife and another, the husband and wife get together only one half. If the land is held till the death of some one of the three, the two survivors will hold the same as if there had been no third. If the act of 1860 or any later act should be held to abolish existing tenancies by entireties, it could at least not constitutionally enlarge the estate of a husband and wife together from one half to two thirds, and therefore, as to existing tenancies by entireties could not obviate this peculiarity resulting from their common-law unity.

8. It is obvious, from a reading of the various statutes, that the legislature had no thought of abolishing the legal unity of husband and wife, but simply of abolishing particular incapacities of married women. Tenancy by entireties imposed on the wife no disability peculiar to that form of tenancy which it did not impose on the husband also. Tenancy by entireties was no more an advantage of the husband than of the wife. Indeed, the advantages of a tenancy in common over a tenancy by entireties would have been at common law, and are still, greater to the husband than to the wife. At common law (and now, if the conveyance were occasioned by payment or pledge of the husband's property) he would have during their joint lives the same right to the management and profits in the one case as in the other, and would also have in the first case a right of alienation and partition without his wife's concurrence which he would not have in the second, while the wife would in neither case have any right to sell or have partition except by joining with her husband. Since the statute of 1860 (if the conveyance were not caused by payment or pledge of the property of the husband) they have during their joint lives equal rights in the property, whether held under the

one kind of tenancy or the other, the statute to this extent modifying the rights of tenants by entireties.   Both at common law and now, the rights of the surviving husband are greater than the rights of the surviving wife when the tenancy is in common, but are exactly equal when the tenancy is by entireties.   The incapacity to change the estate into a tenancy in common, which especially distinguished a tenancy by entireties from a joint tenancy, was a disadvantage of the husband, since, if the change could have been made and was made, it would have been an advantage to him, as above stated.   The incapacity of either to convey without the other was, so far as peculiar to this estate, a disability of the husband, since the wife could not have conveyed without her husband if she were tenant in common.   It is now a disability of both alike.

9. If the court should hold that under a deed to husband and wife made at the present time they would become tenants in common, it would not follow that under a deed made in 1839, making them at the time tenants by entireties, they would since then have become tenants in common.

(*a*) The husband has a vested right to reduce to possession personal property which the wife had during coverture before the act of 1860, although he had not so reduced it before that act. *Smith* v. *Railroad,* 44 N. H. 325; *Nims* v. *Bigelow,* 45 N. H. 343; *Atherton* v. *McQuesten,* 46 N. H. 205; *Caswell* v. *Hill,* 47 N. H. 407; *Sanborn* v. *Batchelder,* 51 N. H. 426; *Woodman* v. *Woodman,* 54 N. H. 226; *Moulton* v. *Haley,* 57 N. H. 184.

(*b*) The husband's rights in real estate owned by his wife during coverture before the act of 1860 are apparently held not to be affected by that act.   *Wood* v. *Griffin,* 46 N. H. 230.   Although we have observed no other case on this point, we think it has been the general understanding of the profession that such rights remain as before the statute.

(*c*) Even if *Miller* v. *Dennett,* 6 N. H. 109, and *Stevenson* v. *Cofferin,* 20 N. H. 150, are correctly decided, they do not decide that the legislature may constitutionally abolish existing tenancies by entireties.   The plaintiffs in this case follow the judge who delivered the opinion in *Miller* v. *Dennett,* in asserting that one joint tenant's right to the moiety of his co-tenant does not vest till the death of the co-tenant.   This is an evident misuse of language. There is no contingent remainder in the case.   The whole title vests at the same time.   A life estate limited after a preceding life estate is not contingent, though it may never take effect in possession.   " It is the present capacity of taking effect in possession, if the possession were to become vacant, and not the certainty that the possession will become vacant before the estate limited in remainder determines, that distinguishes a vested from a contingent remainder." 4 Kent 203.   If the retrospective operation of the statute can be justified at all, it is because the change which it made in vested

estates was closely analogous to changes which one of the joint tenants could make against the other's will. One joint tenant could by conveyance sever the joint tenancy against the will of the co-tenant, who then became tenant with the new owner. One joint tenant could obtain partition the same as if he had been tenant in common. A right so precarious as that of one joint tenant to the continuance of the tenancy in the same form might possibly be within the province of the legislature to take away. But the deed of one tenant by entireties is a nullity. The land cannot be taken on execution against either tenant. Each tenant has an interest (including the right of survivorship) which cannot be taken away or changed by any act of other persons without his concurrence. If this is not such a vested right as cannot constitutionally be taken away or changed by the legislature (except in the exercise of the power of eminent domain), then a new definition of the extent of this limitation upon legislative power is required.

(*d*) The statute of 1809 purported to apply to existing joint tenancies. The statute of 1860 and following statutes do not purport to apply to existing titles, and therefore do not so apply, even if they constitutionally might.

(*e*) If it should be suggested that such rules do not apply to changes resulting from the general drift of legislation, and particularly not to changes resulting from changes in public sentiment,— that, for instance, a husband would not now have the right to chastise his wife, even if the court in *Poor* v. *Poor*, 8 N. H. 307, 313, had expressed an opinion exactly contrary to the opinion it did express,—the answer is, that the cases are not parallel; that questions of title to property are not to be treated the same as questions of what is reasonable treatment of wife by husband, child by parent, servant by master, or the like. Questions of reasonable treatment depend on the character of the community, on the station of parties, and on the usage of the time and community with respect to persons in such station. The nature of a man's rights to use his property sometimes depends on similar considerations; but his title to the property, whether he or another shall own it, whether his deed shall or shall not convey it—these are questions of a different character and are not subject to the same fluctuations.

Doe, C. J. The act of July 21, 1809, provided that all devises and conveyances of real estate to two or more persons shall be taken, deemed, and adjudged to create estates in common and not in joint tenancy unless an intent to create joint tenancy is clearly expressed. Laws, ed. 1830, *p.* 110; G. L., *c.* 135, *s.* 14. The legislature plainly declared their purpose that the act should be applied to grants " which have been" as well as those which " shall be made," with a proviso that it should not affect any estate that had " already vested in the survivor or survivors upon the prin-

ciple of joint tenancy." It has been held that such an act impairs no legal right. *Miller* v. *Dennett*, 6 N. H. 109; *Stevenson* v. *Cofferin*, 20 N. H. 150; Cool. Const. Lim. 360 *n.* 3; Tiedeman Lim. of Police Power, *ss.* 116, 117; Hare Const. Law 823–829. Whether this view is correct (Wade Retro. L., *ss.* 28, 179–185) it is not necessary in this case to inquire. For an exact limitation of the retroactive operation of statutes upon equitable and inequitable rights, remedies and want of remedy, it would seem that there must be some comprehensive test prescribed by a legal principle that has not been clearly defined or generally established in the authorities.

Tenancy by entireties was not abolished by the act of 1809. *Wentworth* v. *Remick*, 47 N. H. 226. The question whether it is abolished by a statute enabling married women to hold property as if they were unmarried, on which there is a difference of opinion (*Pray* v. *Stebbins*, 141 Mass. 219, 223, *Baker* v. *Stewart*, 40 Kan. 442, Tiedeman Real Prop., *s.* 242, *n.* 5, Kel. Cont., *s.* 7), has been settled in this state in the affirmative. *Clark* v. *Clark*, 56 N. H. 105. But from usage, common understanding, and the generally unjust and unconstitutional character of retrospective laws, arises a fair inference of fact that a statute is designed by the legislature for future cases only, unless a retrospective intention is expressly declared or necessarily implied. The act of 1860 (*c.* 2342) is consistent with a purpose that its first section (G. L., *c.* 183, *s.* 1) should be applied only to property acquired after the law took effect; and therefore it is not applicable to the conveyance made to the plaintiff's father and mother in 1839. *Atherton* v. *McQuesten*, 46 N. H. 205; *Phillips* v. *Eyre*, L. R. 6 Q. B. 1, 23–27; Cool. Const. Lim. 370; Hare Const. Law 812; Wade Retro. L., *ss.* 34–50. After her death in 1881 the whole farm was her husband's by survivorship; and at his death in 1887 it passed by his will to two of the defendants.

*Case discharged.*

SMITH, J., did not sit: the others concurred.